Exhibit 7

Nazar v. Harbor Frieght Tools USA, Inc.                                    Mark R. Newton, CPA

---

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

---

VITALIY VLADMIRAVICH NAZAR,    )
individually,    )
    )
    Plaintiff(s),    )
    ) 2:18-cv-00348
    vs.    )
    )
HARBOR FREIGHT TOOLS USA,    )
INC., a Delaware corporation,    )
JOHN DOES 1-100    )
    )
    Defendant(s).    )

---

VIDEO CONFERENCE
VIDEO DEPOSITION UPON ORAL EXAMINATION OF
MARK R. NEWTON, CPA

---

Taken at 3255 N. Ladera Circle
Mesa, Arizona

Defendant objects to the
use of the transcript if the witness is
available to testify - FRE 804, FRC 32(a)

DATE TAKEN:  APRIL 21, 2020
REPORTED BY:  PATSY D. JACOY, CCR 2348

---

**Page 2**

1
2       A P P E A R A N C E S
3  FOR THE PLAINTIFF:
   (Present via video conference)
4
       RACHEL M. LUKE
5      Friedman Rubin PLLP
       1109 1st Avenue, Suite 501
6      Seattle, WA 98101
       206.501.4446
7      rachel@friedmanrubin.com
8
   FOR THE DEFENDANT:
9  (Present via video conference)
10     LAURA A. MARTIN
       Gerber Ciano Kelly Brady, LLP
11     228 Park Avenue South, Suite 97592
       New York, NY 10003-1502
12     914.406.6479
       lmartin@gerberciano.com
13
14 ALSO PRESENT:  NONE
15
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1        DEPOSITION OF MARK R. NEWTON, CPA
2             EXAMINATION INDEX
3
4
5   EXAMINATION BY:              PAGE(S)
6      BY MS. LUKE               4
7
8             EXHIBIT INDEX
9   EXHIBITS FOR IDENTIFICATION        PAGE
10  Exhibit A    90-5 - 3.9.20 Newton Report    71
11  Exhibit B    HSNO Seattle Rate Schedule     71
12  Exhibit C    2020-04-17 Pltf NOD of         71
13      Expert Newton
14  Exhibit D    105-1 - 4.16.20 Newton Supp    71
15      Report
16  Exhibit E    Nazar Schedules 4.16.20xlsx    71
17  Exhibit F    Updated report by Newton       71
18  Exhibit G    Addendum to Exhibit A          71
19  Exhibit H    Net discount rate of Life      71
20      Care Plan offered by Gann
21
22
23
24
25

---

**Page 4**

1        MESA, ARIZONA; APRIL 21, 2020
2              10:05 A.M.
3               --oOo--
4
5   MARK R. NEWTON, CPA, witness herein, having been
6        first duly sworn on oath,
7        was examined and testified
8        as follows:
9
10             EXAMINATION
11  BY MS. LUKE:
12      Q.  All right.  Mr. Newton, good morning.
13      A.  Good morning.
14      Q.  My name is Rachel Luke.  I represent the
15  plaintiff Vitaliy Nazar in this matter.
16         MS. LUKE:  And before I start
17  questioning you I just want to note that the parties
18  have stipulated that the court reporter can administer
19  the oath remotely and virtually due to the ongoing
20  COVID-19 pandemic under FRCP 29(a).  We understand that
21  Mr. Newton is in Arizona while I am in Washington
22  state, I believe our court reporter is also in
23  Washington state, and defense counsel is in New York.
24         MS. MARTIN:  Agree.
25         MS. LUKE:  Thank you.

---

1 (Pages 1 to 4)

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Nazar v. Harbor Frieght Tools USA, Inc.                    Mark R. Newton, CPA

Page 5

1      Q. (BY MS. LUKE)  Just as a reminder, Mr. Newton,
2  I know that you have been deposed many times or have
3  testified many times, but I think with these virtual
4  depositions it's really important that we do not
5  interrupt each other to the best we can.  Feel free to
6  ask for a break if you need one.  And I will have many
7  inartful questions, so please feel free to ask for
8  clarification if you don't understand what I'm asking
9  or a question.
10        Please state your name -- your full name and
11  your professional address.
12      A. Mark Richard Newton, and my professional
13  address is -- JS Held is my company and it's 3535
14  Factoria Boulevard Southeast, Suite 440, Bellevue,
15  Washington and the zip is 98006.
16      Q. Great.  And I'm going to have you pull an
17  exhibit, I'm going to mark what's titled 90-5 - 3.9.20
18  Newton Report.  You should have that there.
19      A. Yes.
20      Q. And I'm going to mark that as Exhibit A to
21  your deposition.
22      A. Okay.
23      Q. And if you want to scroll through that report
24  for just a second, does this look to be a true and
25  accurate version of your report that is dated March 9,

Page 6

1  2020?
2      A. Yes, it appears to be just scanning through
3  it, yeah.
4      Q. Okay.  And the first part of this document
5  includes your -- well, actually Exhibit 1 to your
6  report is your CV.
7      A. Yes.
8      Q. And I believe that begins on page 9 of the PDF
9  if you want to scroll down to that?
10      A. Correct, I got it.
11      Q. Is that CV a complete and accurate and most
12  recent copy?
13      A. Yeah, it's probably not exactly 100 percent
14  accurate because I -- in this version I left off my CPA
15  license because I submitted my application late and so
16  for -- I'm not sure, but for a short period I didn't
17  technically have my license so that's why I left it off
18  of there.  I believe I'm approved, although I'm not 100
19  percent sure because I've never received a letter from
20  them, so when I went on the website in Arizona it
21  indicates my license continues through 2022, February
22  2022.  So they must have approved it, but I haven't
23  received a notice in the mail.
24      Q. Okay.  And is this the first time you've been
25  licensed in Arizona or was this a renewal?

Page 7

1      A. I got that license, let's see, two years ago.
2  I'm not -- I don't recall exactly when, probably about
3  three or four years ago.
4      Q. Okay.  And aside from that Arizona license
5  that should now be included, is there anything else in
6  here that is missing for the most current version of
7  your CV?
8      A. I think the only other thing is under
9  professional associations I still have -- I've been
10  having difficulty renewing the National Association of
11  Forensic Economists on their website, so I need to --
12  technically I'm not in that.  I need to, you know, pay
13  my dues and rejoin that, but I've been a member of that
14  for many years.
15        The last item on the professional associations
16  called Loss Executives Association, I'll have to check,
17  I may not be a member of that because of the situation
18  with the company, for JS Held, and that organization
19  has a limitation of how many what they call associate
20  members can be --
21      Q. I'm sorry, Mr. Newton, I'm getting a lot of
22  feedback on your end and I don't know -- or skipping.
23  I'm not sure if I'm the only one.
24        COURT REPORTER:  No, I am as well.
25        (Discussion off the record.)

Page 8

1      Q. (BY MS. LUKE)  Okay.  Mr. Newton, I think you
2  were explaining some updates to your CV and you were
3  discussing some changes under professional
4  associations.  Can you explain that again?
5      A. Yes.  On the National Association of Forensic
6  Economists, I need to renew that.  So I think
7  technically that's lapsed, but I intend to renew that.
8  I was having difficulty with their website, so I need
9  to follow through on that.  I've been a member of that
10  for probably at least 15 to 20 years.
11        The Loss Executives Association, I may not be
12  a member of that any longer because my old company,
13  HSNO, was acquired by JS Held, and that organization
14  has a limitation on how many what they call associate
15  members are allowed in the organization, and I'll have
16  to double-check on that, but I had volunteered to give
17  that up to other people in JS Held if necessary.
18      Q. Okay.  And just going back to your licenses in
19  Arizona, do you know offhand your license number for
20  Arizona?
21      A. It's -- no, not offhand.
22      Q. Okay.
23      A. I could find it at some point during the break
24  if you want.
25      Q. Sure, that would be great.  And as far as the

2  (Pages 5 to 8)

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Nazar v. Harbor Frieght Tools USA, Inc.                                Mark R. Newton, CPA

Page 9

1  recently presented seminars, did you have any update
2  since that 2017 Wind Energy Losses seminar?
3       A.  No, I don't have any other -- I don't believe
4  so, any others after that.
5       Q.  What was the -- I think the third one down --
6  no, sorry, second one down, Econonuggets - Personal
7  Injury, can you tell me what was that presentation or
8  seminar about?
9       A.  That was -- it was kind of a variety of
10 subjects involving personal injury.  I can't remember
11 exactly the topics.  I just recall that I covered a
12 number of things that I thought would be interesting to
13 lawyers dealing with personal injury cases.  The WDTL
14 is the Washington Defense Trial Lawyers Association.
15      Q.  Okay.  And then going down a little bit
16 further, I noticed there was Preventing Pain - Punitive
17 Damages?
18      A.  Yes.
19      Q.  Can you tell me about what did you present on
20 for that seminar?
21      A.  That seminar was -- I have a vague
22 recollection.  That was back in 2008, so -- but it was
23 discussing sort of the financial elements of looking at
24 punitive damages.  So, in other words, from a forensic
25 accounting perspective analyzing financial statements

Page 10

1  of a defendant who might be subject to punitive
2  damages.
3       Q.  Okay.  And what -- what is your profession?
4       A.  Well, I'm a certified public accountant and my
5  specialty has been -- really for essentially my entire
6  career since 1974 been in forensic accounting and
7  economics, although back when I started we didn't -- I
8  don't think anybody used the term "forensic accountant"
9  back in the '70s, that's a term that came up later, but
10 pretty much from the beginning I've been involved with
11 determining damages.
12      Q.  Okay.  So as a CPA do you ever help prepare
13 taxes or anything like that?
14      A.  No, I don't do that professionally.  I -- I
15 don't think I ever did taxes professionally.  Back when
16 we started, when I started with the company which we
17 called HNSO Accountancy in 1974, we did do some -- the
18 firm did taxes and some audits and regular sort of
19 accounting which I did some of that for my experience,
20 but within about four or five years after I started the
21 company pretty much was 100 percent forensic
22 accounting.
23      Q.  Okay.  And what exactly is forensic
24 accounting?
25      A.  Well, it -- you know, the term "forensic" when

Page 11

1  you look in the dictionary it just means that you
2  really testify in court about your area of expertise.
3  It's come to be thought of as investigative as well
4  because of the TV shows that have forensic doctors and
5  medical people, that kind of thing, but it's sort of
6  thought of now as investigative, but I think of it more
7  as related to testifying in court for the most part,
8  but it's extended even to the areas of services my
9  company provides or people like me provide in
10 non-litigation contexts.  Like we do a lot of insurance
11 claim work for insurance companies on property claims
12 and they usually call us forensic accountants even
13 though most of the time those are not in litigation.
14      Q.  And so your firm, JS Held, only does forensic
15 accounting and not the audits or taxes that we hear
16 about CPAs doing in other contexts?
17      A.  Well, the forensic accounting division, yes,
18 that's true.  The forensic accounting division which
19 I'm part of -- HSNO, which was purchased by JS Held
20 about a year ago, became essentially the forensic
21 accounting division for JS Held, and that division is
22 strictly what I would call forensic accounting in
23 general and we don't do any kind of regular audits and
24 tax and bookkeeping, that kind of thing.
25           The non -- there are a lot of other divisions

Page 12

1  in JS Held that are not related to forensic accounting,
2  including construction consulting and
3  environmentalists, environmental consulting,
4  toxicology, there's a lot of different services the
5  company provides overall.
6       Q.  And is most of that work or a large portion of
7  that work for litigation purposes?
8       A.  I believe so, yes, they do offer that, the
9  other services for litigation purposes, yes.
10      Q.  And do you do any other work other than
11 forensic accounting?
12      A.  For JS Held?
13      Q.  For JS Held or outside of your capacity as a
14 partner at JS Held.
15      A.  Yeah, JS Held -- well, technically I'm not a
16 partner.  Since last June I'm only an employee.
17      Q.  I understand.
18      A.  I'm no longer an owner of the business.
19      Q.  I understand.
20      A.  So it's a little different role than I had for
21 about 40 years at HSNO, but anyway, I'm just an
22 employee and I do forensic accounting.  Outside of
23 working for JS Held I have some business interests in a
24 franchise -- two franchise businesses that -- and a
25 third upcoming that my wife and I own and that she

3  (Pages 9 to 12)

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Nazar v. Harbor Freight Tools USA, Inc.                                              Mark R. Newton, CPA

Page 13

1 runs.
2      Q.  Okay.  Is that --
3      A.  I kind of do the accounting for her on those.
4      Q.  Okay.  But those aren't involved with Harbor
5 Freight Tools at all; is that correct?
6      A.  I'm sorry, I didn't quite catch that question.
7      Q.  Your other businesses that you're involved in
8 don't have any contingency with Harbor Freight Tools?
9      A.  I didn't quite -- I can't quite hear the last
10 two words you said.
11      Q.  Do your other businesses have anything to do
12 with Harbor Freight Tools?  Do they involve Harbor
13 Freight Tools?
14      A.  Oh, no, no, no.
15      Q.  Okay.  I want to go to another exhibit.  I'm
16 going to mark as Exhibit B, it's a document that says
17 HSNO Seattle Rate Schedule 2019.
18      A.  Okay.
19      Q.  Let me know when you have that open.
20      A.  I have that open.
21      Q.  Okay.  Are the rates listed here your current
22 rates for this case?
23      A.  No.  And I'm curious why you have this
24 particular page because we are not HSNO any longer,
25 we're JS Held, and the rates are somewhat -- somewhat

Page 14

1 different than reflected here.
2      Q.  Okay.  So can you just let me -- what is your
3 deposition or trial testimony per hour for you?  I --
4      A.  550 --
5      Q.  -- understand it's not -- I'm sorry.
6      A.  Yeah, sorry.  $550 per hour is my testifying
7 rate.
8      Q.  And at your current position at JS Held, is
9 there a kind of hierarchy of senior partner, partner,
10 senior manager, manager like there is on this document?
11      A.  There's a hierarchy but different terminology.
12      Q.  Okay.
13      A.  So, for instance, I'm a -- I don't have it
14 memorized, I'm sorry.  I am an executive vice president
15 which is, I think, the highest level, and then you'll
16 have senior or vice presidents or assistant vice
17 presidents.  There's a lot of vice presidents in JS
18 Held.
19      Q.  Okay.
20      A.  And then you'll have associates.  And so as
21 you go down the level, of course, the billing rates
22 decline with each level.
23      Q.  And do you have a different rate for your
24 consultation rate per hour?
25      A.  Yes, I charge $525 per hour.

Page 15

1      Q.  Okay.  Did anyone else from either HSNO or
2 from JS Held or even outside of that help you work on
3 your case?  Did anyone else bill any time?
4      A.  Yes.  The -- I believe the primary person that
5 helped me with the calculations is George -- a guy
6 named George McLaughlin who I refer to as a senior
7 economist.  I think his title in JS Held is something
8 like -- let's see, an AVP, assistant vice president
9 maybe, but he did a fair amount of the work for me on
10 this case.  And then also early on I had another
11 associate, and I think his title is -- his name is
12 Brenden Howell and he was -- he's an analyst with JS
13 Held and he had prepared -- or started to prepare some
14 of the calculations.
15      Q.  Okay.  So I'm going to back up a little bit.
16 I think you mentioned you're an executive vice
17 president, VP, at JS Held.  Does that entail anything
18 other than your forensic accounting work that you're
19 testifying about today?
20      A.  Oh, you mean do I have administrative duties,
21 that sort of thing?
22      Q.  Yeah.
23      A.  Not really.  I -- I'm kind of left out of
24 management, so despite the title, I really don't have
25 any management responsibilities to speak of other than

Page 16

1 managing the files that I'm working on.  So I don't
2 deal with HR issues or employees, things of that
3 nature, so I'm kind of lucky in that regard.
4      Q.  And I think you mentioned that you thought
5 George McLaughlin is an assistant vice president.  What
6 type of duties does an assistant vice president have at
7 JS Held?
8      A.  Well, I don't -- I couldn't tell you across
9 the board what the duties are for assistant vice
10 presidents for JS Held, but for George, he's kind of
11 like me, he doesn't really have any management or
12 administrative functions to deal with.  He mainly just
13 works on cases and projects.
14      Q.  Okay.  And is George still employed by JS
15 Held?
16      A.  Is he still employed by them?  Yes, uh-huh.
17      Q.  Okay.  What about the analyst, Brenden Howell?
18      A.  Yes.
19      Q.  Is he still employed by them?
20      A.  Yes, he is.
21      Q.  Okay.  George McLaughlin's billing rate, do
22 you know that?
23      A.  Yes, $325 per hour.
24      Q.  Okay.  And what about Brenden Howell?
25      A.  I don't recall.  It's -- it's approximately

4 (Pages 13 to 16)

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Nazar v. Harbor Frieght Tools USA, Inc.                                    Mark R. Newton, CPA

Page 17

1  $170 per hour.  I'd have to look it up, but it's
2  something in that range.
3      Q.  Have you prepared any invoices to Harbor
4  Freight Tools or to defense counsel in this case?
5      A.  Yes.
6      Q.  Do you know how much you've billed so far to
7  date?
8      A.  Yes.  I think it's -- well, as far as the
9  invoicing I think it's about $7,200 is what has been
10  invoiced.
11      Q.  Do you have any I guess other categories that
12  you would be billing under other than testimony or
13  consultation, maybe document review or some other
14  category?
15      A.  You're asking me what kind of categories I
16  would be billing under?
17      Q.  Yes.
18      A.  In the time -- well, in the timekeeping system
19  we have NetSuite and -- yes, so they'll have kind of a
20  drop-down menu when I go to bill a file and it will
21  have things that I can choose from like document review
22  or reports or meetings.  There are a variety of things
23  and so I can do one of those that I think is the most
24  appropriate and then -- then I put in my time, but I
25  also provide usually a description.  It calls for --

Page 18

1  there's a little box for describing your time as well.
2      Q.  Well, I guess my question is, is that I think
3  you said that your deposition or trial testimony rate
4  is 550 an hour and then your consultation rate was 425
5  an hour I believe.  Do you have any other rates that
6  you charge in this case?
7      A.  Oh, no, 525 was my --
8      Q.  Okay.
9      A.  -- you know, consulting rate.  But no, it's --
10  whenever I'm doing the non-testifying work I charge at
11  the $525 per hour.
12      Q.  All right.  I'm going to go back to Exhibit A
13  again and I'm on page 12 of that PDF.
14      A.  Okay.
15      Q.  And this is your recent testimony list; is
16  that correct?
17      A.  Yes.
18      Q.  Is this the most up-to-date list?
19      A.  It's probably -- it was up-to-date at the time
20  of the report.  I probably have had a couple of other
21  testimonies since then, maybe depositions, I'm not sure
22  about trial but I think deposition perhaps.
23      Q.  Okay.  So the last testimony listed here was
24  February 21, 2020?
25      A.  Yes.

Page 19

1      Q.  Since then what other testimony have you
2  given?
3      A.  I -- I can never remember.  Let me just -- I
4  can look at my calendar and just kind of look back.
5      Q.  Well, if you can provide an updated list that
6  would be great.  Is that something you would agree to?
7      A.  Sure, yeah.
8          MS. MARTIN:  We can provide that.
9          MS. LUKE:  Thank you.
10      Q.  (BY MS. LUKE)  To your knowledge, have you
11  ever been excluded as an expert under a prior Daubert
12  challenge?
13      A.  No.
14      Q.  Have you ever been a party to a lawsuit?
15      A.  No.
16      Q.  Have you ever testified for or on behalf of
17  any attorneys involved in this case?
18      A.  Well, when you say "on behalf of," you mean on
19  a personal level or are you talking about like this
20  where I'm testifying on behalf of Harbor Freight Tools?
21      Q.  On behalf of one of their clients.
22      A.  Oh, okay.  I did see that -- it looked like on
23  one of the documents I saw Foley Mansfield is involved
24  in this matter and there was an attorney -- I can't
25  remember the attorney's name now, but it's somebody

Page 20

1  that I have worked with before testifying on cases for
2  in the past.
3      Q.  And do you know approximately how many cases
4  you've testified on cases with that attorney?
5      A.  No.  I mean, actually I think that more often
6  I've worked with other Foley Mansfield attorneys on a
7  more regular basis.
8      Q.  When did you -- when were you retained in this
9  case?
10      A.  I don't recall, maybe a couple months ago.
11  I'd have to go back and look.
12      Q.  Can you identify the materials that you've
13  reviewed in preparation for your report that you've
14  offered in this case.
15      A.  Sure.  I'm going to refer to an exhibit in my
16  report that you have, I think, as Exhibit A, right, to
17  this deposition.
18      Q.  Okay.
19      A.  And let's see, that is on page 16 of the PDF,
20  and so I've listed out the items on here which include
21  the various discovery responses and interrogatories,
22  Mr. Nazar's deposition, Ms. Tapia's report that she
23  has.  We have social security earnings records, IRS
24  records for tax returns for Mr. Nazar, some wage I
25  think pay stubs from Five Star Trucking, the second

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Nazar v. Harbor Frieght Tools USA, Inc.                    Mark R. Newton, CPA

Page 21

1  amended complaint, the Kutsar deposition Exhibit 4
2  which are employment records, and then the Washington
3  L&I records that's on my chart it's referred to as
4  worker compensation records.
5        In addition, I -- since I prepared that report
6  I also received a report from a Carl Gann who is a -- I
7  think a vocational rehabilitation expert, and I
8  utilized his information and his report for my
9  supplemental report that just came out. And I also
10 received Ms. Tapia's deposition which I read yesterday.
11 I think that covers it.
12       Now, we did also use some reference materials
13 for things like work life expectancy and so we accessed
14 that information as well.
15       Q. Okay. What -- I mean, can you tell me what
16 reference you were using for work life expectancy?
17       A. The Skoog-Ciecka tables from 2019 reports
18 which is the same source of information used by
19 Ms. Tapia.
20       Q. Okay. So when you wrote this report, it's
21 dated March 9, 2020, you did not have Mr. Gann's
22 information, that's correct?
23       A. That is correct.
24       Q. And did you have -- at this point did you have
25 Mr. Choppa -- his life care plan and report?

Page 22

1        A. I don't believe so. I know that Ms. Tapia
2  refers to it in her report, but I don't think I
3  actually -- I don't recall having seen his report, so I
4  may not have it.
5        Q. Is it typically helpful for you to have a life
6  care plan that's proposed by a plaintiff for your
7  analysis?
8        A. If I'm asked --
9             MS. MARTIN: Objection to form.
10            THE WITNESS: Oh, sorry.
11            MS. MARTIN: Go ahead.
12       A. It could be if I'm asked to utilize that
13 information to determine present value. Normally my
14 only role like Ms. Tapia was doing in her report
15 regarding life care plan is to take that information
16 and try to bring it to a present value, and so if I'm
17 asked to do that with the plaintiff's life care plan
18 proposal then I would need that report. And then, of
19 course, if I get one from a defense expert then I would
20 use that to prepare a present value of the life care
21 plan.
22       Q. (BY MS. LUKE) Did you request to have
23 Mr. Choppa's report?
24       A. No.
25       Q. So when you are preparing a forensic report or

Page 23

1  analysis or opinion, do you typically only look at the
2  life care plan and vocational report from whichever
3  side you're representing, here being the defense?
4        A. Not necessarily, no. Sometimes we assess
5  both.
6        Q. And I see that you have an exhibit to the
7  Kutsar deposition which were Mr. Nazar's employment
8  records. Did you have Mr. Kutsar's deposition
9  transcript?
10       A. I don't recall reading -- I don't think so. I
11 think I may just have the records themselves, but I
12 don't recall reading a deposition from him.
13       Q. Did you request to read that?
14       A. No.
15       Q. Let's see here. So you had sent -- after --
16 since this March 9, 2020 report, you have received
17 Mr. Gann's report and you supplemented this report.
18 Have you had any consultation with Mr. Gann?
19       A. No.
20       Q. And that's neither by phone or email
21 correspondence?
22       A. Yeah, no, I've had no contact with Mr. Gann at
23 all.
24       Q. Do you typically consult with the vocational
25 rehabilitation expert in an injury case such as this

Page 24

1  when you're providing your report?
2        A. Not always, but quite often, yes.
3        Q. Is there a reason why you haven't consulted
4  with Mr. Gann?
5        A. Well, I think that in reading his report, just
6  reading his report, the information in there was
7  sufficient for me to use for my calculations without
8  speaking to him.
9        Q. Let's go -- I'm going to mark as Exhibit C the
10 document that says 2020-4-17 Plaintiff NOD of Expert
11 Newton.
12       A. This is the notice of video deposition?
13       Q. Yes. Have you seen this document before?
14       A. I believe so. I think I reviewed it
15 yesterday.
16       Q. Okay. At the very bottom it says:
17 Defendant's attorneys are reminded that they have
18 agreed to produce complete copies of their expert's
19 file in this matter at least three business days prior
20 to their expert's respective depositions.
21       Were you made aware of this agreement?
22       A. Yes, I believe I was aware of the three-day
23 time period.
24            MS. MARTIN: Note my objection.
25            MS. LUKE: Laura, what's your objection

6 (Pages 21 to 24)

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Nazar v. Harbor Frieght Tools USA, Inc.                                                    Mark R. Newton, CPA

Page 25

1    based on?
2                MS. MARTIN:  Seeks privileged
3    information under the rules regarding expert discovery
4    so he's already answered the question.
5          Q.  (BY MS. LUKE)  So last night we received your
6    new expert report.  I'm going to go ahead and pull that
7    as Exhibit D and mark that, and that should show up --
8    it says 105-1 - 4.16.20 Newton Supp Report.
9          A.  Okay, I've got that open.
10         Q.  Great.  We'll mark that as Exhibit D.  And
11   then let's go ahead and also at the same time mark as
12   Exhibit E, there's some spreadsheets dated -- it says
13   Nazar Schedules 4.16.20, let's mark that.
14         A.  Oh, the Excel files?
15         Q.  Yeah.
16         A.  The Excel file?  Okay.
17         Q.  Okay.  So this --
18               MS. MARTIN:  I'm sorry.  Exhibit E is
19   which one?  I apologize.
20               MS. LUKE:  That's okay.  That's the
21   Nazar schedule dated 4.16.20.
22               MS. MARTIN:  Okay, thank you.
23               MS. LUKE:  Yep.
24         Q.  (BY MS. LUKE)  For your supplemental report,
25   does this document reflect your current opinions in

Page 26

1    this case?
2          A.  Yes.
3          Q.  And I'm going to have you walk me through this
4    in just a minute.  I noticed that your report at
5    Exhibit D and the schedules that were produced with
6    your file last night which is Exhibit E are both dated
7    April 16, 2020.  Is that when you finalized this
8    report?
9          A.  Yes, I believe so, yes.
10         Q.  Is -- is there any reason that you know of why
11   they were not produced to plaintiff until last night?
12               MS. MARTIN:  Objection, seeks privileged
13   information.
14               THE WITNESS:  Should I answer?
15               MS. MARTIN:  No.
16               THE WITNESS:  Okay.
17         Q.  (BY MS. LUKE)  Did you -- but these were
18   finalized on the 16th?
19         A.  Yes, I believe so.
20         Q.  When did you receive Mr. Gann's report?
21         A.  Let's see, I don't recall.  I think about a
22   week or so before that.  May have been as early as
23   April 6th, but I'd have to go back and check the emails
24   to be sure about that.
25         Q.  And when were you asked to provide the

Page 27

1    supplemental report?
2          A.  I believe I was asked to provide --
3                MS. MARTIN:  Again, objection, seeks
4    privileged information, but you may answer.
5          A.  Okay.  I -- my recollection is it would have
6    been around the time I received Mr. Gann's report.  I
7    don't -- again, I don't have a specific recollection of
8    that point.
9          Q.  (BY MS. LUKE)  Okay.  And did -- when you
10   reviewed Mr. Gann's report as you were preparing this
11   supplemental, did you disagree with any of Mr. Gann's
12   opinions?
13         A.  The only thing that I sort of questioned a
14   little bit was the -- but I haven't made any change
15   related to it was the part of the life care plan
16   calling for the health club, and just based on what I
17   pay, the amount of $63 a month seemed a little high.
18   Also the assumption that Mr. Nazar would have that
19   membership through -- I think through his life
20   expectancy is probably a little too long, but even if I
21   made those changes, they wouldn't amount to much --
22   much difference really, so I didn't bother with it.
23         Q.  Has -- does this report dated April 16, 2020
24   replace your March 9, 2020 report in its entirety as
25   far as your opinions?

Page 28

1          A.  I don't think entirely, no.  I think -- it's
2    just a different set of assumptions.  So the
3    calculations and opinions I provide in my first report
4    on March 9th are still applicable given the assumptions
5    that I was making at that time.  So it doesn't really
6    change my opinion.  It's just that now I have a new
7    calculation based on a different assessment by Mr. Gann
8    as far as the earning capacity potential for Mr. Nazar
9    going forward.
10         Q.  Okay.  So you don't have a changed opinion as
11   far as, you know, calculating his past loss and future
12   loss then?
13               MS. MARTIN:  Objection, asked and
14   answered.  You may answer again.
15         A.  Well, yeah, there is a difference between the
16   two reports and so, in other words, I have a different
17   opinion in the supplemental report based upon
18   Mr. Gann's findings and his opinions than what are
19   presented in my first report which were based primarily
20   on Ms. Tapia's approach and she was using Mr. Choppa --
21   or Choppa, I'm not sure how you pronounce it, but
22   Mr. Choppa's report and information.
23         Q.  (BY MS. LUKE)  So can you maybe walk me
24   through these opinions?  I believe they start on page 4
25   of the PDF.

7 (Pages 25 to 28)

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Page 29

1     A. And this would be which -- are you talking
2  about my first report or the second report?
3     Q. I'm sorry, that's your supplemental report,
4  Exhibit D.
5     A. Sure, okay. So you want to start on Schedule
6  1.0?
7     Q. Sure. I mean, if you can -- just because, you
8  know, it's been less than 24 hours since we received
9  this --
10    A. Sure.
11    Q. -- if you can summarize your opinion and if I
12 have follow-ups I can do that.
13    A. Okay. Yeah, and it's -- there's sort of --
14 it's set up similarly, but there's a -- you know, quite
15 a bit of a different result on this report based on
16 Mr. Gann's opinions and assessment. But it's a similar
17 setup on the subsequent schedule so -- but I'll start
18 on Schedule 1.0 which is page 8 of the PDF of the
19 exhibit.
20    Q. Okay.
21    A. And this is just a summary of the calculation,
22 and what I show are the losses and mitigation for the
23 past and future in total. You can see in the third
24 column over which is entitled Lost Wages As Diesel
25 Mechanic, all together for total damages I show a total

Page 30

1  lifetime damage over his work life of $1,119,853, and
2  ultimately the mitigation earnings I show as an
3  equivalent amount so that there ends up being no loss,
4  and in reality, based on Mr. Gann's report, if
5  Mr. Nazar can get a four-year degree and obtain a
6  position in some of the careers that Mr. Gann mentioned
7  in his report, his earning potential over his lifetime
8  is much greater than if it would have been as a
9  diesel mechanic. So his overall earnings will exceed
10 the diesel mechanic earnings and that's shown on
11 schedule -- the next schedule.
12    Q. So in this schedule that we're looking at
13 right now, I think it's page 8 of Exhibit D, you have a
14 column that says Mitigation Earnings. What would is
15 included in mitigation earnings? I assume it's income?
16    A. Yeah.
17    Q. Assuming the four-year degree?
18    A. Correct, yes. So the mitigation earnings are
19 comprised of reimbursed or payments from Washington L&I
20 which I assume that he -- Mr. Nazar would be able to
21 receive through the end of his college education
22 period. And he has been receiving it up -- as far as I
23 know up to this date, so I assume that that would
24 continue. Then once he graduates from college then he
25 would then increase his earnings up to a wage based on

Page 31

1  the various categories that Mr. Gann outlined in his
2  report.
3     Q. Okay. And as far as that increased earnings,
4  what -- what does that go to as far as how high does
5  that go? I know that there was a median -- there was
6  talk about median wages, 75th percentile. Where would
7  he land based on your calculations here?
8     A. Yes, what I did was to -- to -- let me just
9  check my footnotes to make sure I state this. So --
10 and I'm referring to page -- Schedule 2.0, which is on
11 page 10 of the PDF. This is in the footnote area for
12 Schedule 2.0.
13    Q. Okay.
14    A. So what I did is once he graduates I assumed
15 that he would receive a job at the 10 percentile level
16 of earnings for the first two years. After that he
17 would graduate to 25 percentile level for three years.
18 Then I assumed he would then achieve a median wage
19 level starting after five years, and then after ten
20 years I assumed that he would obtain a -- he would
21 reach the 75 percent -- percentile level.
22    Q. Do you know -- since we're looking at page 10
23 here, do you know if these categories that Carl Gann
24 has outlined, architect, mechanical engineer,
25 electrical engineer, etcetera, do you know if those are

Page 32

1  only inclusive of bachelor degree earners or do those
2  wages reflect people who have bachelor's plus a
3  master's or perhaps even a Ph.D. education?
4     A. I don't know. I assume that they related to a
5  four-year degree because that was my understanding of
6  what Mr. Gann was providing in his report, that
7  information. He indicated that Mr. Nazar would be
8  capable of getting a four-year degree and he indicated
9  these types of fields that he had the capability and
10 interest in potentially.
11    Q. Could -- you don't know which source that
12 Mr. Gann was relying on for that data?
13    A. No.
14    Q. Now, I believe in your previous report --
15 actually let me pull this up. So I'm going to
16 Exhibit A and page 5 of that PDF.
17    A. Okay.
18    Q. The second bullet point from the very bottom,
19 the second sentence of that is you offered an
20 alternative -- and this is an assumption -- where
21 Mr. Nazar reaches a median wage level for a diesel
22 mechanic that does not increase after that except for
23 normal inflation. Why is it that in your previous
24 report we were talking about median levels and in your
25 most recent report we're talking about going up to the

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

FRE 401-403 - Relevance - Newton's opinions on earnings changed from 1st to 2nd report due to advanced evaluation so submitting info to jury from 1st report is misleading and confusing

Case 2:18-cv-01896 filed 07/17/20 PageID.6667 Page 9 of 20

Nazar v. Harbor Frieght Tools USA, Inc.      Mark R. Newton, CPA

**relevant to the credibility of the experts opinons regarding damages.**

---

Page 33

```
 1   75th percentile within, I think you said, five years?
 2       A.  Well, actually ten years.
 3       Q.  Ten years?
 4       A.  So it would be ten years that he -- yeah.
 5   Well, I mean, I provided two alternatives in my first report.
 6   The second of those was making the assumption that Mr.
 7   Nazar would stabilize at the median level for
 8   a diesel mechanic.  The first, though, was using kind
 9   of a similar ramp up of increased earnings based on the
10   percentile levels for diesel mechanics that Ms. Tapia
11   used in her report.  So I was just offering an
12   alternative, a different way to look at it.
13       Q.  So -- but you believe that with the additional
14   education -- or you're accepting, I guess, an
15   assumption that with the additional education Mr. Nazar
16   can get up to the 75th percentile in these professional
17   careers?
18       A.  Yes, in my second report, yes, yes, and that's
19   according to Mr. Gann.  Now, he -- Mr. Gann did not
20   provide the exact time frame over which Mr. Nazar would
21   have ultimately achieved the 75 percentile level.  The
22   time frames over which he graduates to the level that I
23   just talked about in my footnote in that report is --
24   is just an estimate by myself in that regard.
25       Q.  Okay.  If we can go back to Exhibit D on page
```

Page 34

```
 1   8?
 2       A.  Yes.
 3       Q.  Just going back to that mitigation earnings, I
 4   think you mentioned that you have included -- you've --
 5   L&I payments, and so you assumed he'll continue to
 6   receive that through college.  What do you base that
 7   assumption on?
 8       A.  I base that assumption on the fact that he has
 9   been receiving it, and the assumption is is that he
10   still would not be working because of his injury at
11   that point.  So I assumed that he will continue to
12   receive those benefits because of that.
13       Q.  And then you said that it would also include
14   his earnings which would increase over time.
15       A.  Yes.
16       Q.  Does it include -- does it also include
17   benefits?
18       A.  Let's see, yes, we've included benefits.  If
19   you again look at page 10 of Exhibit D, the PDF 10,
20   you'll see that we've calculated the wages of the
21   different types of jobs for the various percentile
22   levels we discussed and then we add 29.9 percent as
23   benefits.
24       Q.  And as far as the benefits, I guess, on that
25   line, 29.9, that's almost 30 percent.  Is that typical
```

Page 35

```
 1   for someone to receive almost 30 percent of their
 2   earnings as benefits?
 3       A.  Yes, particularly for these types of
 4   positions, yes, 29.9 percent would be a, I think,
 5   actually somewhat conservative average benefit level
 6   for these types of professional positions.
 7       Q.  What is the source for that 29.9 or -- for the
 8   data?
 9       A.  I believe -- you know, I don't recall.  I'll
10   have to look that up.  I didn't review that this
11   morning.  I believe typically we would get it from
12   Bureau of Labor Statistics.
13       Q.  Okay.  Is there anything else you wanted to
14   walk me through with the most recent report in your
15   opinions?
16       A.  Sure, yeah.  I think if we look at page 9 of
17   the PDF, this is the -- sort of the guts of the
18   calculation showing all the information that leads to
19   the summary on Schedule 1.0, and so it just shows the
20   annual amounts for lost earnings, the annual amounts
21   for mitigation earnings and retraining, and then we
22   identify it for the period of time that -- the length
23   of time for each of the rows because not every row is
24   one year and then we show the discounted amounts.
25           Now, what I do want to point out is a change
```

Page 36

```
 1   that we talked about earlier this morning where I found
 2   an error on the schedule.  If you look at the middle
 3   column under the heading Loss & Mitigation Portion of
 4   Year, and then there's the Mitigation Earnings -
 5   Retraining, and you'll see the first number is $25,610.
 6       Q.  Yes.
 7       A.  Do you see that?  That number should be -- I
 8   can't remember the number, but it should have been --
 9   we multiplied 25,610 by the figure in the third column
10   which says Period in Years 0.78, do you see that?
11       Q.  Okay.  So it was an adjustment because it
12   wasn't a full year?
13       A.  Because it's not a full year.  But when we did
14   the calculation we mistakenly treated it as a full
15   year.  So that affects that number.  The next two
16   numbers are okay because they're full year, but then
17   the same problem exists for that fourth column down
18   where it says $27,040, that should have been multiplied
19   by 0.62.
20       Q.  Okay.
21       A.  So --
22           MS. LUKE:  If you have the correct
23   version, if you want to screen share maybe we can mark
24   that as -- let's see, we're on Exhibit F.
25           MS. MARTIN:  You should see it now and
```

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Nazar v. Harbor Frieght Tools USA, Inc.                    Mark R. Newton, CPA

Page 37

1   it should start with -- we're on the third column, top
2   line, three rows over should be 19,976; is that right,
3   Mr. Newton?
4          THE WITNESS:  Yes.
5          MS. MARTIN:  Okay.
6          MS. LUKE:  Okay.  So if you can
7   circulate that and then Patsy can get that marked as
8   Exhibit F.
9          MS. MARTIN:  Not a problem.
10         MS. LUKE:  Thank you.
11     A.  Now, that same issue affects one of the
12  schedules and one of the scenarios.  The scenario I had
13  of the diesel mechanic at median wage that same mistake
14  occurs.
15     Q.  (BY MS. LUKE)  In the previous -- I'm sorry.
16     A.  Yes.
17     Q.  In the previous report from Exhibit A?
18     A.  Yes.  So there's a slight change to that
19  number where it increases the -- lowers the mitigation
20  so the loss calculation goes up by around $30,000.
21         MS. MARTIN:  One second here and I'll
22  share that with you as well.  Is this what you're
23  referring to, Mr. Newton?
24         THE WITNESS:  Is that -- yes, exactly,
25  yeah.

Page 38

1      Q.  (BY MS. LUKE)  So this is the correct
2   calculation that should have been in the Exhibit A
3   second scenario?
4      A.  Yes.
5      Q.  Okay.  So let's mark this as Exhibit G, and
6   it's really an addendum to what you had in Exhibit A.
7          MS. MARTIN:  Yes.  And it's a
8   substantive change of approximately $30,000, and then
9   the other change was a net change of zero for Exhibit
10  F.
11         MS. LUKE:  Okay.  Can we go back to
12  Exhibit F?  I just had a couple questions on there.
13     Q.  (BY MS. LUKE)  Mr. Newton, what are the
14  highlights representing here?
15     A.  The highlights -- well, the first highlight
16  just represents the point at which Mr. Nazar would have
17  achieved the median wage of the diesel mechanic that
18  was used by Ms. Tapia, and this is derived from the
19  version where I used the -- from the first report where
20  I used the median wage.  I looked at that also this
21  morning.  If I used the other approach which gave him
22  an increase over time up to the 75 percentile level it
23  doesn't change really the overall result of the opinion
24  if I use that in the -- for this report.
25         The highlights in the -- in the other two

Page 39

1   columns over to the right, that reflects the point at
2   which the cumulative mitigation earnings exceed the
3   cumulative losses that Mr. Nazar had suffered.  So, in
4   other words, by the years 2030, Mr. Nazar would have
5   mitigation earnings of about $650,000 in the far right
6   column compared to cumulative losses of about $641,000.
7   So by that point, sometime in 2030, he will have been
8   about break even at that point.
9      Q.  So I know that you had incorporated the L&I
10  payments into the mitigation earnings.  Did -- where --
11  I mean, how -- how -- where is that and how can we see
12  that here in this spreadsheet?
13     A.  So if you look in the second column -- or the
14  middle -- very middle column that says Mitigation
15  Earnings - Retraining, again, that's the area where I
16  made the mistake before, so the $19,976 reflects the --
17  the L&I earnings and then the $25,610 reflects that.
18     Q.  Okay.  And how long does that go through?
19  What year does that --
20     A.  I have that -- I have that continuing
21  through -- let's see.  I have that continuing through
22  2024.
23     Q.  And that's when you assumed that Mr. Nazar
24  would finalize his school?
25     A.  Yes.

Page 40

1      Q.  Or a bachelor's degree?
2      A.  Yes.
3      Q.  Okay.  Does the mitigation earnings also
4   include the cost of tuition?
5      A.  The cost of tuition, let me see here.  Yes, it
6   does.  So, in other words, you'll notice that in --
7   before he goes to college, the L&I is about $25,000 a
8   year, and you'll notice that during the four years
9   where he's going to college it drops to 13,857 per
10  year.  So I took out the -- what I subtracted in the
11  calculation I took out -- I subtracted out the cost of
12  tuition out of there.  So I -- so that's why that's
13  lower.  I reflected the cost of the tuition in that
14  figure.
15     Q.  Okay.  As far as college or a bachelor's
16  degree, are you making any assumptions as far as how
17  long it will take Mr. Nazar with his injury and
18  accommodations necessary to finish that degree?
19     A.  I assumed it would be four years.
20     Q.  And in this --
21         MS. LUKE:  Laura, if you could just
22  scroll down a little bit to the bottom, thank you.
23     Q.  (BY MS. LUKE)  In this scenario that you've
24  outlined here, it looks like the work life expectancy
25  is a little -- is longer now than in your previous

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Nazar v. Harbor Frieght Tools USA, Inc.                    Mark R. Newton, CPA

| Page 41 | Page 43 |
|---|---|

**Page 41**

1    schedule from the old report.  Can you explain that?
2        A.  I don't -- let me just double-check.  I don't
3    think that's the case.  Let's see.  Yeah, you're right,
4    it probably is because the previous report carried his
5    work life out to 2052 and that was based on the
6    Skoog-Ciecka tables, the work life tables for a person
7    with some college because the assumption he would be --
8    in the first report was that he would achieve an
9    associate's degree from a junior college.  And in this
10   report, the newer report, I'm assuming a four-year
11   degree.  So when you look at the tables, the --
12   definitely the work life of an individual goes up as
13   they have more education.  It's even greater for those
14   that get doctorate degrees and professional degrees
15   like a lawyer and so forth.
16       Q.  And so I understand that the work life is
17   not -- it's not specific to Mr. Nazar, but with someone
18   who is injured and has his damages, do you think it's
19   fair to expect a longer work life expectancy for
20   someone in his situation if he received a four-year
21   degree versus a two-year degree?
22       A.  I'm not sure I understand the question.
23       Q.  Can you -- I mean, for Mr. Nazar specifically,
24   would you expect that there would be a -- that ten-year
25   change in work life expectancy if he had a four-year

**Page 42**

1    degree versus a two-year degree?
2        A.  Oh, no, it's not a ten-year change, it's about
3    a two-year change.  So in this report we have his work
4    life through March of 2054, and I'm looking at my other
5    report and we have it through the end of 2052.  So we
6    actually have only about a year and two and a half
7    months extra.
8        Q.  Okay.
9        A.  Based on the college degree.
10       Q.  And then if we go to -- actually I'm going
11   to -- view options?
12           MS. MARTIN:  Are you done with these?  I
13   can share them again later if you need to.
14           MS. LUKE:  Yeah, I think I am.
15           MS. MARTIN:  Okay.
16           MS. LUKE:  Thank you.
17       Q.  (BY MS. LUKE)  So I'm looking at your previous
18   report and I understand that the Mitigation Earnings
19   column have now been amended, but I just wanted to --
20   let's look at this one.  If we're at page 21 of Exhibit
21   A?
22       A.  Okay, yes.
23       Q.  Okay.  So in the far left, we have a work life
24   ends at 2041 if Mr. Nazar does not receive his GED, if
25   he stays as is without any retraining; is that correct?

**Page 43**

1        A.  Correct, yeah, what he presumably would have
2    been doing but for the injury he suffered.
3        Q.  Okay.  And then -- and I understand your
4    opinion as far as the amount of college has changed,
5    but if we go down to the end it says in 2052 his work
6    life would end in that year; is that correct?
7        A.  Correct, yes.
8        Q.  So given that his work life expectancy with no
9    GED before injury was 2041, does education totally
10   mitigate his ability to continue working despite his
11   injuries so that he would be able to continue working
12   until 2052?
13       A.  I don't think I understand the question.
14       Q.  Do you think his injuries have any bearing on
15   his work life expectancy?
16       A.  I don't know.  You mean in terms of where I'm
17   assuming or I have calculated from the tables that he
18   has a work life through 2052, I guess what you're
19   asking me is will his injury -- does that have some
20   impact on what his work life might be compared to what
21   the tables would show; is that what you're saying?
22       Q.  Yes, sure, yeah.
23       A.  I don't -- I don't know.  I -- my gut feeling
24   is it shouldn't necessarily because these are positions
25   or jobs that presumably don't require a lot of

**Page 44**

1    physical -- strenuous physical activity to do the job.
2    It's more of a professional type of a job, kind of like
3    what we all do, but different obviously, but it's a
4    professional position that doesn't depend on his
5    physical capabilities -- or it would seem to me.
6        Q.  Are you aware of any accommodations that
7    Mr. Nazar would need in any position, I guess, that
8    isn't physical?  So for the four or, I guess, several
9    positions that Mr. Gann has outlined, would Mr. Nazar
10   need any accommodations still to perform the duties
11   necessary?
12           MS. MARTIN:  Objection, outside the
13   scope of this witness's testimony.  You can answer.
14       A.  I don't know.  Yeah, I couldn't tell you what
15   accommodations might be necessary.  It's possible with
16   using a computer he would have to use more voice
17   recognition.  I don't know to the extent that he would
18   be impaired to use both hands for typing and so forth,
19   but my understanding there are ways to mitigate that
20   circumstance so that somebody can use a computer.
21   Beyond that, I don't know what other needs he might
22   have.
23       Q.  (BY MS. LUKE)  Let's see, we're still on
24   Exhibit A.  In your previous report where you -- and
25   I'm going back to page 5 of Exhibit A, we already

BUELL REALTIME REPORTING, LLC
206.287.9066 l 800.846.6989

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Nazar v. Harbor Frieght Tools USA, Inc.                    Mark R. Newton, CPA

Page 45

1   talked about this, but one of the assumptions you made
2   was that Mr. Nazar reaches the median level wage for a
3   diesel mechanic, but does not increase after that
4   except for normal inflation.
5        Do you see that?
6        A. Yes.
7        Q. It was the second-to-last bullet point there?
8        A. Yes, yes, I have it here.
9        Q. Okay. Is your -- what do you base that median
10  off of? What is the basis for that conclusion?
11       A. Well, it's an assumption, so it's not -- but I
12  think what I was thinking at the time was that -- that
13  despite the fact that Ms. Tapia was using a vocational
14  rehabilitation expert to obtain some of these earnings,
15  including that Mr. Nazar might be able to achieve the
16  75 percentile level for that wage category, is that
17  when we look at the historical earnings for Mr. Nazar,
18  he typically wasn't at a completely full-time level
19  based on his history. So to me that brought into some
20  question -- some question into my mind that perhaps
21  that he might not attain the level of 75 percentile, so
22  that's why I offered that as a -- as a -- an approach
23  to determine what his damage might be if he reaches the
24  median level.
25       Q. Okay. And this may be -- and hopefully it

Page 46

1   isn't redundant. I did want to go into the Nazar
2   schedule. I think we've marked those as Exhibit --
3   let's see, what are they, C, and those are dated
4   4/16/20?
5        A. And these are the Excel schedules?
6        Q. Yes, yeah.
7        A. Okay, I have those open.
8        Q. Great. So I think this includes all of your
9   calculations in both Exhibit A and B. Is that correct?
10       A. This is for -- particularly for Exhibit B, my
11  second report, right, that's B?
12       Q. Okay.
13       A. And then -- I mean, they're similar looking to
14  what I had in the first report. I used the first
15  report as a template for these, but there's a separate
16  Excel file for the first report.
17       Q. I guess my question, if we go to the last tab,
18  Tapia Calc?
19       A. Yes.
20       Q. Can you explain what this is.
21       A. I think what this is -- I didn't really focus
22  on this that we prepared -- was just it's a
23  regurgitation of what Ms. Tapia had calculated.
24       Q. Okay. And then I just noticed that there's a
25  bunch of highlights under Discount Factor and I'm

Page 47

1   curious what those are about.
2        A. I don't know. This probably was prepared by
3   Mr. Howell. I didn't ask him about what these
4   highlights mean.
5        Q. Okay. Okay. Let's go back to Exhibit A. I
6   guess my main concern is what opinions from Exhibit A
7   do you no longer have or are replaced by your opinions
8   in Exhibit B, and I want to start at -- I think it's
9   page 7.
10       A. Okay.
11       Q. So at the top of page 7 you are assuming the
12  same inflation rate that Dr. Tapia did at 2.175 percent
13  for future wages; is that correct?
14       A. Yes.
15       Q. And is that continued on in your calculation
16  in Exhibit B?
17       A. Exhibit B? Sort of. I kind of changed what I
18  did in Exhibit D. It's a very similar calculation, but
19  I -- normally what I use is a concept called net
20  discount rate which Ms. Tapia has not used and so what
21  I use typically for a net discount rate for lost
22  earnings is a 1 percent net discount rate, and what
23  that number reflects is the -- it reflects the
24  relationship between inflation and interest rates.
25       So in simple terms, the -- over a long period

Page 48

1   of time, over like 25 years or so, the interest rates
2   on safe government-backed securities averages about 1
3   percent more than what inflation is. So you get a 1
4   percent discount rate. So I do that rather than trying
5   to determine what the particular inflation rate might
6   be for a particular type of job, and part of that is to
7   avoid kind of a misconception when you look at the
8   amount of wage.
9        For instance, Ms. Tapia calculates at some
10  point that -- I believe they get up to $135,000 a year
11  or more for a diesel mechanic after 30 or 40 years of
12  work, and that seemed like a high number, so it's hard
13  to know whether that inflation rate that she uses --
14  which is for all wages, but the inflation rate that
15  Ms. Tapia is using is not just for diesel mechanics,
16  it's for kind of all wage categories for the most part,
17  and so --
18       Q. I guess my same question was is the same rate of
19  inflation that you're using in your new report?
20       MS. MARTIN: Excuse me, I was on mute.
21  You cut him off so I'd like to let him finish answering
22  the question and then you can answer -- you can ask the
23  question, Rachel. So, Mr. Newton, if you want to
24  finish what you were saying.
25       A. Sure. I was just saying, yeah, so that's why

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Nazar v. Harbor Frieght Tools USA, Inc.                    Mark R. Newton, CPA

Page 49

1   I tend to avoid -- not always, there's some cases where
2   I would use a similar approach that Ms. Tapia used
3   here, but most of the time I'm using the net discount
4   rate.  So the other side of the inflation rate, the
5   other concept is the interest rate that you discount
6   earnings and so that's why I believe that
7   relationship between inflation and interest over a long
8   period is about a 1 percent difference, and so I --
9   I've kind of backed into the interest rate in my
10  calculation in the first report to get to a net
11  discount rate of 1 percent.  In the second report
12  you'll note if you look at the details of it I just
13  used the 1 percent discount rate.
14       Q.  Okay.  So you're getting that 1 percent
15  discount rate -- you say it's the 1 -- or 3.175 percent
16  minus 2.175 percent?
17       A.  Correct.
18       Q.  To get the 1 percent?
19       A.  Correct.
20       Q.  And I guess my question is where are you --
21  where does -- what is the source for the 3.175 discount
22  rate?
23       A.  Well, it's basically -- actually it's backing
24  into it to get to a 1 percent discount rate.  The 1
25  percent discount rate is based upon -- I'm looking at

Page 50

1   the schedules -- which one was the Excel file, Exhibit
2   D?
3       Q.  Let me see here.
4           MS. MARTIN:  E, Exhibit E is the Excel
5   file for the second report.  The Excel file for the
6   first report has not been marked as an exhibit.
7       A.  Okay.  So if you look at Exhibit E.
8       Q.  (BY MS. LUKE)  Okay.
9       A.  And -- it wasn't part of the PDF printout of
10  the report, but if you look at that Excel file there's
11  a tab called Data 2.0, and that accumulates all sorts
12  of wage growth, inflation, interest rates and so forth
13  that we update each year and utilize to estimate what
14  we think discount rates are, and that's -- that's where
15  I derive basically my 1 percent discount rate.
16      Q.  Okay.  So this is -- I'm sorry, that -- in
17  Exhibit E, that Data 2.0, this is something that your
18  firm has put together, this spreadsheet?
19      A.  Yes.  We -- we often have it in the Excel
20  workbook as a spreadsheet.
21      Q.  And so you just always rely on that net
22  discount rate of 1 percent in all of your reports that
23  you create for your forensic accounting?
24      A.  Not all, there are some reasons why we would
25  use a different rate in particular circumstances, but

Page 51

1   for the most part we're using -- we're pretty
2   consistent on using 1 percent net discount rate.  Where
3   we vary, for instance, if somebody has a pension, say
4   I -- I do a lot of asbestos cases and so quite often
5   the assumption is that the injured party or sometimes
6   it's a wrongful death case where the injured party or
7   decedent had a pension and sometimes those pensions do
8   not have cost of living adjustments.  So in those
9   cases, rather than using a net discount rate I use a
10  discount rate because there is no inflation for that
11  type of income stream as an example.
12      Q.  Okay.  So let's go back to page 12 on
13  Exhibit A.  These are your recent testimonies.  In that
14  Lassen Tour & Travel, Inc. v. Ctour Holiday, LLC, do
15  you know if you used that 1 percent net discount rate
16  in your opinion?
17      A.  That -- I did not.  That is a -- trying to
18  think if I used a discount rate.  I think the damages
19  are all past -- if I recall correctly, past damages.
20  It doesn't involve a personal injury.  It's a dispute
21  between two companies over unfair competition.
22      Q.  Okay.  What about Lynnwood Health Services,
23  Inc. v. Affiliated FM Insurance Company, et al., did
24  you use that 1 percent net discount rate there?
25      A.  No.  Those are -- again, those are all past

Page 52

1   damages in that case, so there wouldn't be a discount
2   rate applied.
3       Q.  What about --
4       A.  And, again, it's not -- not a personal --
5   those are -- and just to help --
6       Q.  Sure.
7       A.  -- be a little efficient on the deposition,
8   pretty much anything on this page, this is called
9   General Litigation, so most of this -- these cases are
10  going to be commercially related litigation matters,
11  disputes between companies.
12      Q.  Okay.  So --
13      A.  There's another section later on that's the
14  asbestos litigation and those are all personal injury/
15  wrongful death cases.
16      Q.  I'm sorry, which page is that asbestos
17  litigation?
18      A.  Yeah --
19          MS. MARTIN:  15.
20      A.  Yeah, so in the general litigation, I'm not
21  usually using a net discount rate that I can think of.
22  There may be some personal injury cases on that list
23  where I would be because I've excluded the asbestos
24  into a separate category because I've done a lot of
25  asbestos, but everything on the asbestos page is going

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Nazar v. Harbor Frieght Tools USA, Inc.                    Mark R. Newton, CPA

Page 53

1    to be personal injury/wrongful death.
2        Q. (BY MS. LUKE)  Okay.  So on -- I guess
3    starting on page 15, did you use the 1 percent net
4    discount rate on all of these cases?
5        A.  I would say yes.  The only exception -- the
6    exceptions would be -- and I -- would be in some of
7    these likely there's a plaintiff who had a pension
8    without a cost of living adjustment, so there we
9    wouldn't use the 1 percent, and we might be using 2 or
10   3 percent in those cases.  Also, in a few of these
11   categories, a couple here and there might have been
12   plaintiffs who owned a business, and in some of those
13   when it's a business I don't use the net discount rate,
14   I use a business risk adjusted rate.
15       Q.  Okay.
16       A.  Which is usually far greater than a 1 percent
17   discount rate.
18       MS. MARTIN:  Rachel, before we -- can we
19   just take a quick three-minute break if you don't mind?
20       MS. LUKE:  Sure.  Let's do about ten
21   minutes?
22       MS. MARTIN:  Sure.
23       (Recess taken.)
24       Q. (BY MS. LUKE)  As far as your opinion in the
25   report that was submitted yesterday, do you preserve

Page 54

1    any of your opinions that are in your March 9th report?
2        A.  I didn't quite catch the word.  Do I what any
3    of my opinions?
4        Q.  Are you preserving any of those opinions?
5        MS. MARTIN:  Objection, asked and
6    answered.  You may answer again.
7        A.  Well, I'm preserving them at least in regard
8    to being a comparison or a critique of aspects of
9    Ms. Tapia's calculations.
10       Q. (BY MS. LUKE)  Understood.  So you're not
11   going to offer any opinions as to the standard of care,
12   causation or the life care plan and costs?
13       A.  No, no, I don't -- those are outside of my
14   role, other than for the life care plan where we've
15   discounted the cost to present value.
16       Q.  And you've never medically assessed
17   Mr. Nazar's future needs?
18       A.  No.
19       Q.  Are you qualified to prepare a medical care
20   plan for any -- anybody?
21       A.  No.
22       Q.  If you can turn to --
23       MS. MARTIN:  He has calculated the net
24   discount of the life care plan offered by Gann if you
25   want to see it, but if not, that's fine.

Page 55

1        MS. LUKE:  Well, actually, I was going
2    to have him turn to that on his report.
3        Q. (BY MS. LUKE)  Mr. Newton, if you could point
4    that out to me, I'm not familiar with --
5        MS. MARTIN:  It's not contained in
6    either of the documents.
7        A.  Oh, yeah, no.  Yeah, I didn't complete that
8    until last night.
9        Q. (BY MS. LUKE)  Okay.  Why don't you go ahead
10   and walk me through that then.
11       A.  On the life care plan?  Do you have --
12       MS. MARTIN:  I can screen share it for
13   you.  You should see it.  It's an 11-page PDF.  There
14   you go.
15       Q. (BY MS. LUKE)  All right.  And so this has
16   never been submitted to plaintiffs before?
17       A.  No.
18       MS. MARTIN:  No.
19       A.  Well, unless -- and I don't -- I'm assuming it
20   wasn't, yeah.  I -- I sent it to counsel last night.
21       Q. (BY MS. LUKE)  Okay.  And when were you asked
22   to provide this?
23       A.  Yester --
24       MS. MARTIN:  Objection, asks for
25   privileged information.

Page 56

1        A.  Sorry, I answered too quickly.
2        COURT REPORTER:  I didn't hear the
3    answer.  What was your answer, Mr. Newton?
4        THE WITNESS:  I said yes --
5        MS. MARTIN:  He said yesterday.
6        Q. (BY MS. LUKE)  Okay.  So why don't you walk me
7    through this.  I see you have --
8        A.  Sure.
9        Q.  We're on page 3.  Is that the --
10       MS. MARTIN:  It's -- there you go.  Page
11   1 is title, page 2 is the index, page 3 starts the
12   substantive information.
13       A.  Page 3 is a summary of the costs and we've
14   categorized it by different categories of services, and
15   we show a -- the non-discounted costs along with the
16   discounted amount.  And so overall the total costs
17   including the contingent on an outcome of surgery is
18   $380,000 which is discounted at present value as of
19   August 15, 2020 at $314,000, approximately.
20       Q. (BY MS. LUKE)  Okay.  And so --
21       A.  To provide for detail.
22       Q.  And I think you've already mentioned this, but
23   you have not consulted with Mr. Gann to prepare this;
24   is that correct?
25       A.  No, correct.

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Page 57

1    Q. This is based on -- purely on his report?
2    A. Correct.
3    Q. Okay. Let's go ahead and mark this as
4  Exhibit H and Laura can circulate afterwards. Should
5  we go down to Schedule 2?
6    A. Sure.
7    Q. Okay. And so these are your calculations?
8    A. Yes.
9    Q. Okay. So you have Physician Services, a
10 one-time evaluation with the hand surgeon?
11   A. Correct.
12   Q. Okay. And these unit costs, are those
13 provided to you by Mr. Gann?
14   A. Yes.
15   Q. And the frequency, that was also provided by
16 Mr. Gann?
17   A. Yes.
18   Q. Okay. And so you are only calculating the
19 discounted costs total?
20   A. Correct, correct.
21   Q. And that's -- we see that in the far
22 right column?
23   A. Correct, yeah.
24   Q. Okay. And so this is a --
25   A. There's no -- yeah, and to know -- just so you

Page 58

1  understand the organization, if you could scroll down
2  just slightly so we see the titles, yeah. So in the
3  second column we show page and item, so if you look at
4  Mr. Gann's report he has about a six-page-long document
5  that lists out all the different services and costs.
6    Q. Uh-huh.
7    A. And so, for instance, with the first item up
8  there on this page that says Orthocor system 4.6, so
9  that's on page 4 and it's the sixth line item down
10 where he has numbers. Now, not all of the line items
11 that Mr. Gann talks about in his report show -- show
12 costs for various reasons. So we've included all of
13 the categories that include a cost that we then
14 extrapolate out over the -- over the period indicated
15 by Mr. Gann and then we discount it. But I just -- so
16 if you turn to page 4 of Mr. Gann's -- not his report
17 but the section where he does the calculations on the
18 life care plan, you would look at the 6.5 and down on
19 that page and find this item.
20   Q. Okay. So as far as -- I guess there's a
21 couple things. As far as items where there was no
22 costs included in Mr. Gann's report you have not
23 calculated those; is that correct?
24   A. Correct.
25   Q. Okay. And then if, for example, there is a

Page 59

1  range, I'm looking at the household assistance, and he
2  said two to four times per month for life, how did you
3  calculate that? Did you make -- did you create a range
4  in your total?
5    A. I know on one where he said three to five
6  years we used four years. Let me look at the
7  calculation itself so I can -- because I can check the
8  formula in there for it. I just need to open up that
9  file. And this is the Orthocor, and you were looking
10 at the -- which item were you looking at now? Oh,
11 household --
12   Q. Yeah, that's just an example.
13   A. Yes, we assumed three. So if you look in
14 the -- the figure that -- under Frequency?
15   Q. Uh-huh.
16   A. And you look you see 36.0?
17   Q. Yes.
18   A. For that line item, that's three times per
19 month. So where he -- Mr. Gann indicated two to four
20 times per month we took the average of three.
21   Q. Okay. Is there a reason why you didn't
22 provide a range?
23   A. Well, we could have. I could have done the
24 low and high, but I just decided to use -- we decided
25 to use an average.

Page 60

1    Q. Okay. If we could just go back up to the
2  summary, and so this is basically a summary of your
3  opinion with regard to the discounted rate for the life
4  care plan; is that correct?
5    A. Yes.
6    Q. Okay. Is there anything else on this -- I
7  don't know if it's a PDF that you wanted to discuss as
8  far as relating to your opinions on that life care plan
9  value?
10   A. Sure. If we go back down to Schedule 2 again
11 and maybe go to the first page, so -- so the reason why
12 we didn't just list out each item, you know, page -- we
13 kind of start off that way on this page with -- under
14 Physician Services, Item 1.1, 1.2, 1.3, but then you
15 see we jump to 2.5. So what we did was to group -- we
16 looked through the listing of all the -- of the costs
17 that Mr. Gann listed and we categorized them into
18 categories, so in this case physician services, and
19 that was so that we could apply a particular discount
20 rate for that category.
21      So, for instance, you'll see in the column
22 over to the right that's entitled 1x cost, first year,
23 and you look down a couple of rows there you see a 0.19
24 percent.
25   Q. Yes.

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Nazar v. Harbor Frieght Tools USA, Inc.                                    Mark R. Newton, CPA

Page 61

1    A.  That's the discount rate we used.  Okay?
2    Q.  Okay.
3    A.  So as opposed to a -- the net discount rate
4    I'm using for the earnings, the wages of 1 percent,
5    we're using different types of rates for the medical
6    costs.
7    Q.  Okay.
8    A.  And in some cases it's a negative discount
9    rate.  In other words, if you go down to
10   Hospitalizations on that page, you'll see the negative
11   1.41.  So where the cost for that surgery is $40,000,
12   the present value of it is $40,285, so it's a little
13   bit higher because according to the -- you know, over
14   the last 30 years, the cost of hospitalization has
15   exceeded, you know, interest rates.
16   Q.  Okay.  So as far as your -- whatever --
17   whatever rate is in that 1x column, what is the basis
18   or source that you're using to come up with that
19   percentage rate?
20   A.  Right.  So if you scroll down to -- let's see,
21   Schedule 4.0, that provides -- that page there -- yeah,
22   let's stop there for a moment.  So this is Schedule
23   4.0, and so what we're saying is that where we think
24   there's a -- if we look just at the discount rate, we
25   would project a negative discount rate, it's kind of a

Page 62

1    real discount rate of 1 percent, and we calculate it on
2    a subsequent schedule, what we call the premium over
3    inflation, in other words, the amount cost of these
4    medical services have either been more than or less
5    than overall inflation, general inflation based on CPI,
6    and then we add those two together and we get the
7    discount rate we use for each category.
8    The basis for these figures in the middle
9    column are shown on the subsequent schedule, 4.1, and
10   this lists the various indices or increase rates for
11   each of these categories over -- going back to 1978,
12   and if you go down to Schedule -- the next page on 4.1,
13   we summarize the -- we calculate averages and I've used
14   the 30-year average for the premium.  So if you look at
15   the bottom page, bottom line on this page it shows the
16   premium -- premium over inflation for each category,
17   and that's derived from the 30-year average which you
18   can see kind of up in the middle of that page where
19   we've calculated for the average.
20   Q.  So these numbers, which source did they come
21   from?
22   A.  They come from generally the Bureau of Labor
23   Statistics.
24   Q.  Okay.  So if I looked up any of these on the
25   Bureau of Labor Statistics I would be able to track it

Page 63

1    back on their website?
2    A.  I believe so.  I can double-check that and see
3    what the exact source is, but -- but we're using
4    generally government studies to derive these inflation
5    rates.
6    Q.  Okay.  And when you say "we," are you
7    referring to -- Mr. Howell and Mr. McLaughlin?
8    A.  In this case I'm referring to Mr. McLaughlin
9    who's, like I said earlier, a senior economist, so
10   he -- I generally have him prepare these calculations
11   for me.  I -- and then I reviewed it yesterday.  I
12   actually changed it.  I changed the premium rates to
13   the 30-year average which slightly increased the
14   discount value.
15   Q.  What did he calculate it at?
16   A.  He calculated the -- it wasn't much of a
17   change, but if you go back to -- let's see, if I look
18   at Schedule --
19         COURT REPORTER:  Can you hear him?  I
20   can't hear him.
21         (Discussion off the record.)
22         COURT REPORTER:  "At Schedule," and then
23   if you could pick up from there, I'm sorry.
24   A.  Sure.  Schedule 1.0, I've calculated $314,000,
25   and Mr. McLaughlin's calculation using his rates was

Page 64

1    about $311,000 as I recall.
2    Q.  (BY MS. LUKE)  Okay.  So as far as your
3    opinions in this case, as we sit here today, are they
4    contained within what we've discussed today in your
5    deposition, this life care plan present value
6    calculation document that we received today and the two
7    reports you've already produced?
8    A.  I believe so.  I guess I haven't fully
9    commented on some critiques of Ms. Tapia's approach.
10   Q.  Okay.  I do have some questions about that, if
11   we go back to Exhibit A.  Now, I -- I believe that you
12   have -- on page 5 you discuss some of the assumptions
13   that Dr. Tapia makes.  I believe that you have adopted
14   some of those assumptions and not others.  So if we
15   could go through maybe your bullet points here?
16   A.  Sure.
17   Q.  So the first one you said that Dr. Tapia
18   assumes that Mr. Nazar would have worked full time
19   throughout his work life.  Is that an assumption that
20   you are making?
21   A.  I have, yes.
22   Q.  Okay.  That work life of 24.5 years at the
23   time of the accident for one approach, that was one of
24   Dr. Tapia's assumptions?
25   A.  Correct.

FRE 401-403 - Relevance,
Speculation - Question asks what
counsel could look up

BUELL REALTIME REPORTING, LLC
206.287.9066  l  800.846.6989

FRCP 32(a)(6) rule of completeness

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Nazar v. Harbor Frieght Tools USA, Inc.                                    Mark R. Newton, CPA

Page 65

1    Q. And then the other approach was work life of
2  approximately 40 years to age 67 or full social
3  security retirement age.
4    A. Correct.
5    Q. She assumed that Mr. Nazar would have
6  increased his earning capacity for a diesel mechanic in
7  the Spokane area to the median level by age 32, the
8  75th percentile wage by age 37 to 38 and the 90th
9  percentile at age 45; is that correct?
10    A. Correct.
11    Q. And then she assumed that Mr. Nazar might not
12  obtain further education and would have to accept
13  minimum wage jobs for only part-time work 20 hours a
14  week because of his injury. And then the last --
15    A. Correct.
16    Q. Sorry. And then the last one that you have
17  there was her assumption that Mr. Nazar might be able
18  to obtain his GED and a two-year associate's degree in
19  order to obtain a better replacement job and earn more
20  than minimum wage. So if you want to go through that,
21  with regard to work life, I think that you had
22  differences in that approach. Can you tell me what
23  your approach is on work life?
24    A. Well, I used the same work life I believe in
25  the first report, this report for 24 and a half years

Page 66

1  based on his educational level and as the but for work
2  life if he had not been injured. So it was the same in
3  that regard. However, a couple things on the work
4  life. Although I think Ms. -- Dr. Tapia, I call her
5  Dr. Tapia, sorry, Dr. Tapia's approach there is
6  correct, the way she applies the work life for a part
7  college under -- assuming her assumption where he gets
8  retrained and has higher education is that in one of
9  her scenarios she stops the assumption of work life for
10  the new job at the same age, and I think that's
11  inappropriate because he has a longer work life with
12  the higher educational level. So she didn't offset the
13  extra ten years roughly according to the tables that
14  Mr. Nazar would have been able to work with the part
15  college approach that would tend to offset the losses
16  that occurred up to the 24 and a half year point in
17  time.
18    My other critique on the work life is the
19  assumption that he would work until 67 social security
20  retirement level, and based on the tables for somebody
21  at his educational level before injury, it's -- it's
22  speculative for Ms. Tapia to assert that approach, and
23  I say it's speculative because that's even beyond the
24  90 percentile. In other words, that's the -- that --
25  the percentage of people that would achieve a work life

Page 67

1  to that point in time is probably -- it doesn't even
2  show on the tables. It's probably less than 5 percent.
3  So the chance that he would work until that age is
4  certainly under 10 percent and probably under 5
5  percent. It makes it very unlikely that that would
6  occur and, therefore, speculative.
7    Q. Do you -- I mean, given that Mr. Gann is
8  assessing that Mr. Nazar is in the 95th percentile in
9  his IQ, does that change your analysis as far as that
10  point? Mr. Gann's opinion to me seems that Mr. Nazar
11  has unlimited potential.
12    A. Well, I certainly think his IQ level certainly
13  has a bearing on Mr. Gann's opinions and findings with
14  regard to Mr. Nazar and his ability to obtain a
15  four-year degree and so certainly pertinent to that.
16  But prior to injury he didn't have a GED and the tables
17  for somebody at that level show what the work life is
18  at a far lower rate than age 67, and so I -- the thing
19  is is that neither Dr. Tapia or I or Mr. Gann or
20  Mr. Choppa, Choppa, can predict what would have
21  occurred with Mr. Nazar in his work life had he not
22  been injured, and so what we revert to are objective
23  studies like these work life tables that are based on
24  government statistics and then utilized by renowned
25  economists in the field to develop these tables.

Page 68

1    We revert to those sources because we don't
2  have any way to know. We don't know whether he would
3  have worked only 15 more years, we don't know whether
4  he would have worked 40 years, but if we use the tables
5  and use the median level which is the 50 percent point
6  where it becomes more probable than not, then we're
7  achieving something -- we're utilizing something that's
8  objective in my mind. That's why Dr. Tapia did, in
9  fact, use the tables to some extent and that's why I
10  use the tables and most economists that I see use the
11  similar tables that we used in this case.
12    Q. Okay. As far as the increasing of earning
13  capacity, I think you had different or differing
14  opinions from Dr. Tapia on that as well?
15    A. I think the only thing is I didn't get him up
16  to the 90 percent level, percentile level. I think I
17  stopped at 75 percent level.
18    Q. Okay.
19    A. And then I had the second alternative where I
20  assumed he just reached the median level.
21    Q. Okay. And then the other assumption was
22  regarding his -- that he may not obtain further
23  education and would have to accept minimum wage jobs if
24  he doesn't get retraining?
25    A. Yes, I think I did use the minimum wage job,

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Nazar v. Harbor Frieght Tools USA, Inc.                    Mark R. Newton, CPA

Page 69

1  but I assumed that he would be capable of working 40
2  hours per week.
3      Q.  And that was -- assumption was in -- I guess
4  correlation to Mr. Gann's report?
5      A.  No, because I prepared this report before I
6  had Mr. Gann's report.
7      Q.  Okay.  Maybe I should distinguish.  I'm
8  wondering -- I want to know if that's -- if these are
9  your current opinions still today.  So --
10     A.  Oh, yes, it is.  In other words, I -- I saw
11 that Mr. Choppa indicated he might only be able to work
12 20 hours per week, but in looking at everything I
13 couldn't see why that was necessarily the case because
14 of his disability that he wouldn't be able to obtain
15 full-time education, I -- I just didn't see a reason --
16 I mean full-time work at 40 hours per week.  So that's
17 where I differ in opinion with what Mr. Choppa provided
18 in his report that Dr. Tapia relies upon.
19     Q.  Okay.  Are there any other of Dr. Tapia's
20 analysis or assumptions that you disagree with here?
21     A.  I think that was it.
22     Q.  Okay.
23     A.  I think we've covered the differences in
24 opinion that I have.  We do have a slight difference of
25 opinion on the discount rate.  I don't think it's --

Page 70

1      Q.  Yeah.
2      A.  I don't know how much it is, but it's slightly
3  different there.
4      Q.  Do you typically take notes as you're
5  coming -- as you're working on your reports or coming
6  up with opinions?
7      A.  Typically not.  We usually -- in most of the
8  cases we put reports in -- we put the notes in the
9  reports.  So, for instance, on the Excel file that you
10 have, if you looked at Data 1.0 and Data 2.0, things of
11 that nature, in our reports a lot of times those
12 include the notes that we derive from source documents
13 in the file like interrogatories, sometimes deposition
14 notes.  So we didn't really have all of that in this
15 case to speak of.  We do have a Data 1.0, but if we had
16 a lot of notes we typically put them in the report.
17     Q.  Okay.  So you didn't -- you didn't take any
18 notes on the depositions other than what's noted here
19 in the Data 1.0 or 2.0?
20     A.  Correct, I did not.
21     Q.  Did you -- have you discussed the case with
22 any other experts that were retained in this case?
23     A.  No.
24     Q.  And do you have any current plans to consult
25 or discuss this case with Mr. Gann between now and

Page 71

1  trial?
2      A.  I have no such plans at this point.  If
3  counsel directs me to do that for some reason, I would
4  do it, of course.
5      Q.  And is -- have we talked about all of your
6  opinions you intend to testify about at trial?
7      A.  I believe so, yes.
8          MS. LUKE:  So I don't believe I have any
9  other questions for you today.  I am going to reserve
10 the right to continue this deposition with regard to
11 the new opinions that were produced last night and
12 today after I have the chance to review them.  Laura?
13         MS. MARTIN:  No questions at this time.
14 And feel free to ask Mr. Newton, but I believe he would
15 like to reserve his right to read and sign.
16         THE WITNESS:  Yes, I would.
17         MS. LUKE:  All right.  And, Patsy, I
18 will order an electronic copy, please.
19         MS. MARTIN:  Same here, please.
20         (Exhibits Nos. A - H were marked.)
21         (Deposition concluded at 12:15 p.m.)
22         (Reading and signing was requested
23           pursuant to FRCP Rule 30(e).)
24
25

Page 72

1
2          C E R T I F I C A T E
3
3    STATE OF WASHINGTON  )
                          )
4    COUNTY OF KING       )
5
6        I, Patricia D. Jacoy, a Certified
7  Shorthand Reporter in and for the State of Washington,
8  do hereby certify that the foregoing transcript of the
9  deposition of MARK R. NEWTON, CPA taken on
10 April 21, 2020 is true and accurate to the best of my
11 knowledge, skill and ability.
12
13
14     Patricia Jacoy
15     Patricia D. Jacoy, CSR 2348
16
17
18
19
20
21
22
23
24
25

18  (Pages 69 to 72)

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)



# E R R A T A

**CASE NAME:**  Nazar v. Harbor Frieght Tools USA, Inc.

**DATE TAKEN:** 04/21/2020

**WITNESS:**   Mark R. Newton, CPA

## CORRECTIONS

| Page | Line | Now Reads | Should Read |
|------|------|-----------|-------------|
| _____ | _____ | NONE | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

_____
Signature of Deponent

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066  Tacoma 253.235.0111
e-mail info@buellrealtime.com   www.buellrealtime.com



# D E C L A R A T I O N

**CASE NAME:**  Nazar v. Harbor Frieght Tools USA, Inc.

**DATE TAKEN:** 04/21/2020

**WITNESS:**  Mark R. Newton, CPA

       I declare under penalty of perjury under the laws of the State of Washington that I have read my within deposition, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the ERRATA flyleaf page hereof.

Mark R. Newton, CPA

Signed on the ___13TH___ day of _____May_____, 2020.

1325 Fourth Avenue, Suite 1840  Seattle, Washington  98101
708 Market Street, Suite 408  Tacoma, Washington  98402
Seattle 206.287.9066  Tacoma 253.235.0111
e-mail info@buellrealtime.com   www.buellrealtime.com